**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

UNITED STATES OF AMERICA,

           Plaintiff,

           v.

Khalid Ouazzani,

           Defendant.

No. 10-00025-CR-W-BCW

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S PRO SE MOTION TO REDUCE SENTENCE
PURSUANT 18 U.S.C. § 3582(c)(1)(A)(i) – COMPASSIONATE RELEASE**

The United States of America, through the undersigned attorneys, provides the following response in opposition to Khalid Ouazzani's motion for compassionate release. Ouazzani seeks to have his 168-month sentence for bank fraud, money laundering, and material support to a designated foreign terrorist organization reduced to time served based upon extraordinary and compelling reasons. Ouazzani argues extraordinary and compelling reasons exist because the coronavirus (COVID-19) places him at risk if he remains in the custody of the Bureau of Prisons (BOP). (D.E. 65.) Because Ouazzani has not exhausted his administrative remedies, and has not demonstrated extraordinary and compelling reasons justifying a reduction, the United States opposes the request and asks this Court to deny his motion.

## I. Procedural History

On February 3, 2010, a grand jury in the Western District of Missouri returned a 33-count indictment charging Ouazzani with 18 counts of bank fraud, in violation of 18 U.S.C. § 1344; five counts of money laundering, in violation of 18 U.S.C. § 1956; five counts of money laundering, in violation of 18 U.S.C. § 1957; two counts of interstate fraud, in violation of 18 U.S.C. § 2314; and

three counts of false statements to a government agency, in violation of 18 U.S.C. § 1001. The indictment included an allegation of criminal forfeiture related to the funds obtained by fraud.

Ouazzani was arrested on the afternoon of Friday, February 5, 2010, and has been in custody since his arrest.

On May 19, 2010, Ouazzani pled guilty pursuant to a written plea agreement to Count Eleven and Count Twenty-Three of the original indictment, and stipulated to the forfeiture allegation. (D.E. 28.) Ouazzani also pled guilty to a single-count information charging him with conspiracy to commit material support to a terrorist organization, in violation 18 U.S.C. § 2339B. (D.E. 26.) The information charging him with material support stated that Ouazzani conspired with unnamed others, who have since been publicly identified as two defendants charged separately with material support of terrorism in the Southern District of New York.

The nature and circumstances of Ouazzani's offense are detailed in his presentence investigation report (PSR), the Government's sentencing memorandum, and the Government's supplemental sentencing memorandum, all of which are filed under seal with this Court. (PSR ¶¶ 11-29; D.E. 48; D.E. 59.) As a brief summary, Ouazzani engaged in a number of financial frauds, including fraudulently obtaining several mortgages that he later defaulted on. He then laundered the fraud proceeds, including by transferring funds overseas and buying property in foreign countries. Ultimately, Ouazzani provided some of the funds that he obtained by fraud and laundered overseas to a designated foreign terrorist organization to which he swore his allegiance to support.

On October 7, 2013, the district court sentenced Ouazzani to 48 months for the bank fraud and money laundering counts to be served consecutively to 120 months for the material support

count, for a total sentence of 168 months' imprisonment. (D.E. 63) The court also ordered Ouazzani to pay a total of $484,941.41 in restitution to several victims. (D.E. 63.)

Based on the information made available on the Bureau of Prisons Inmate Locator, Ouazzani's release date is January 9, 2022. *See* https://www.bop.gov/inmateloc/.

On May 14, 2020, Ouazzani filed a motion for compassionate release and asserts that the current situation regarding the coronavirus (COVID-19) places him at risk if he remains in custody. (D.E. 65.) Ouazzani is currently in custody at FCI Safford in Safford, Arizona. That facility does not report any current or recovered cases of COVID-19 among either inmates or staff. *See* https://www.bop.gov/coronavirus/index.jsp.

## II. First Step Act

The First Step Act, effective December 21, 2018, provides inmates the ability to file a motion for compassionate release, an ability previously only vested in the United States Bureau of Prisons (BOP). Under 18 U.S.C. § 3582(c) a court may not modify a term of imprisonment once it has been imposed except that, under subsection § 3582(c)(1)(A), a court may reduce a term of imprisonment upon finding "extraordinary and compelling reasons," if such reduction is consistent with applicable policy statements of the Sentencing Commission, after considering the factors set forth in 18 U.S.C. § 3553(a), and after determining a defendant is not a danger to the community as provided in 18 U.S.C. § 3142(g). (U.S.S.G. § 1B1.13(2).). The pertinent policy statement, U.S.S.G. § 1B1.13, defines specific medical, age, and family circumstances as possibly justifying a sentencing reduction under this statute, and further authorizes a sentencing reduction based on an extraordinary and compelling circumstance identified by the BOP. (§1B1.13 Commentary n.1(D).)

The statute, 18 U.S.C. § 3582(c)(1)(A), originally permitted judicial relief only upon a motion by the Director of the BOP. Section 603(b) of the First Step Act now permits courts to act "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

As the proponent of a motion, the inmate bears the burden of proving both that they have satisfied the procedural prerequisites for judicial review—*i.e.*, that they have "exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on [his] behalf" or that 30 days have lapsed "from the receipt of such a request by the warden"—and that "extraordinary and compelling reasons" exist to support the motion. 18 U.S.C. § 3582(c)(1)(A); *see United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) ("[A] defendant, as the § 3582(c)(2) movant, bears the burden of establishing that a retroactive amendment has actually lowered his guidelines range in his case.").

### III.  <u>Ouazzani Has Failed To Exhaust Administrative Remedies</u>

This Court lacks authority to act on Ouazzani's motion for compassionate release at this time. The statute requires that a request for compassionate release be presented first to the Bureau of Prisons for its consideration; only after 30 days have passed, or a defendant has exhausted all administrative rights to appeal the Bureau's failure to move on the defendant's behalf, may a defendant move for compassionate release in court.

The compassionate release statute provides, in pertinent part:

The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . .

18 U.S.C. § 3582(c)(1)(A).

The statutory restriction is mandatory, and it continues to serve an important function during the present crisis. The Government is very mindful of the concerns created by COVID-19, and the BOP is making its best effort both to protect the inmate population and to address the unique circumstances of individual inmates.

The Third Circuit recently held that a defendant seeking COVID-19 compassionate release must meet the 30-day exhaustion requirement with BOP:

We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like [defendant]. But the mere existence of COVID-19 in society and the possibility that it might spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread. Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance. And given the Attorney General's directive that BOP "prioritize the use of [its] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic," we anticipate that the exhaustion requirement will be speedily dispatched in cases like this one.

*United States v. Raia*, 954 F.3d 594 (3d Cir. 2020) (citations omitted).

Without giving a date or any additional details, Ouazzani merely states that he has "sought via the provisions of Section 603(b) of the First Step Act to make the required request before the institutions Warden for the presentment of my release as to these factors, who directed me to the

Unit Team, and thereafter have not responded." (D.E. 65 at 4.) Ouazzani does not actually claim that he made the required request, only that he sought to, and provides no further information than claiming, without documentation or dates, that "[i]t has been longer than 30 days" without a response. (D.E. 65 at 4.) At this time, Ouazzani has not met his burden to show that he has exhausted his administrative remedies and a dismissal is appropriate.

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 825 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only pursuant to statutory authorization. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

Consistent with that principle of finality, § 3582(c) provides that a court generally "may not modify a term of imprisonment once it has been imposed," 18 U.S.C. § 3582(c), except in three circumstances: (1) upon a motion for reduction in sentence under 18 U.S.C. § 3582(c)(1)(A), such as that presented by Ouazzani; (2) "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure," 18 U.S.C. § 3582(c)(1)(B); and (3) where a

-6-

defendant was sentenced "based on" a retroactively lowered sentencing range, 18 U.S.C. § 3582(c)(2).

Given the plain language and purpose of the statute, the requirements for filing a sentence reduction motion—including the requirement that a defendant exhaust administrative remedies or wait 30 days before moving in court for compassionate release—are properly viewed as jurisdictional. Section 3582(c) states that a "court may not modify" a term of imprisonment except in enumerated circumstances. 18 U.S.C. § 3582(c). It thus "speak[s] to the power of the court rather than to the rights or obligations of the parties," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (citation omitted), delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority.'" *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam)). That conclusion is reinforced by the historical powerlessness of the courts to modify a sentence after the expiration of the term at which it was entered. *See United States v. Mayer*, 235 U.S. 55, 67-69 (1914); *United States v. Welty*, 426 F.2d 615, 617-18 & n.8 (3d Cir. 1970). Section 3582(c) accordingly has been understood as conferring the jurisdictional authority that previously was lacking by providing express statutory authorization to modify otherwise final sentences.[1]

---

[1]A number of courts have recognized that the prerequisites for relief under § 3582(c)(2), which allows a sentence reduction based on a retroactive guideline amendment, are jurisdictional. *See, e.g.*, *United States v. Auman*, 8 F.3d 1268, 1271 (8th Cir. 1993); *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010); *United States v. Williams*, 607 F.3d 1123, 1125-26 (6th Cir. 2010); *United States v. Austin*, 676 F.3d 924, 930 (9th Cir. 2012); *United States v. Graham*, 704 F.3d 1275, 1279 (10th Cir. 2013); *United States v. Mills*, 613 F.3d 1070, 1078 (11th Cir. 2010); *see also United States v. Higgs*, 504 F.3d 456 (3d Cir. 2007) (canvassing history of judicial treatment of Rule 35 as jurisdictional and holding that Rule 35(a) and § 3582(c)(1)(B) remain jurisdictional after *Bowles*). Other courts disagree. *See, e.g.*, *United States v. Johnson*, 732 F.3d 109, 116 n.11 (2d Cir. 2013); *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015).

We recognize that, in recent years, the Supreme Court has cautioned against imprecise use of the "jurisdictional" label, and explained that a statutory claim-processing rule, even if mandatory, is presumed to be nonjurisdictional absent a clear statement to the contrary. *See Fort Bend County v. Davis*, 139 S.Ct. 1843, 1848-50 (2019). A prescription is not jurisdictional merely because "it 'promotes important congressional objectives,'" *id*. at 1851 (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169 n.9 (2010)), and courts should not deem jurisdictional rules that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). But whether a prescription is jurisdictional turns on Congress's intent, which is properly determined by the text, context, relevant historical treatment, and purpose of the provision. *Henderson*, 562 U.S. at 436. Here, the relevant factors indicate that § 3582(c) sets forth a jurisdictional limitation on a district court's authority to modify a sentence, such that a district court lacks jurisdiction to consider a motion for compassionate release where a defendant has failed to satisfy the exhaustion requirement of § 3582(c)(1)(A).[2]

While the Government maintains that the time limitation in § 3582(c)(1)(A) is jurisdictional, given that it stands as an exception to the historic and fundamental rule that courts may not revisit a final criminal judgment, the point is ultimately academic. Even if the exhaustion requirement of § 3582(c)(1)(A) is not jurisdictional, it is at least a mandatory claim-processing rule and must be enforced if a party "properly raise[s]" it. *Eberhart*, 546 U.S. at 19 (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the

---

[2]Although we use the term "exhaustion requirement," to be clear, an inmate need not "exhaust" administrative remedies if the motion is filed in court 30 days after receipt of a request by the warden.

verdict, is a nonjurisdictional but mandatory claim-processing rule).  The Government raises the

rule here, and it must be enforced.[3]

The Supreme Court reaffirmed that principle in *Ross v. Blake*, 136 S.Ct. 1850 (2016), in

which the Court rejected a judicially created "special circumstances" exception to the exhaustion

requirement stated in the Prison Litigation Reform Act of 1995 (PLRA).  That Act mandates that

an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge

prison conditions.  42 U.S.C. § 1997e(a).  Rejecting the "freewheeling approach" adopted by some

courts of appeals, under which some prisoners were permitted to pursue litigation even when they

had failed to exhaust available administrative remedies, *Ross*, 136 S. Ct. at 1855, the Court

demanded fidelity to the statutory text, explaining that the "mandatory language" of the exhaustion

requirement "means a court may not excuse a failure to exhaust" even to accommodate exceptional

circumstances.  *Id.* at 1856.  The Court stated:

> No doubt, judge-made exhaustion doctrines, even if flatly stated at first, remain
> amenable to judge-made exceptions.  *See McKart v. United States*, 395 U.S. 185,
> 193 (1969) ("The doctrine of exhaustion of administrative remedies . . . is, like most
> judicial doctrines, subject to numerous exceptions").  But a statutory exhaustion
> provision stands on a different footing.  There, Congress sets the rules—and courts
> have a role in creating exceptions only if Congress wants them to.  For that reason,
> mandatory exhaustion statutes like the PLRA establish mandatory exhaustion
> regimes, foreclosing judicial discretion.

 *Id.* at 1857.

That rule plainly applies to the statutory text here. § 3582(c)(1)(A) unambiguously permits

a motion to the court only "after the defendant has fully exhausted all administrative rights to

---

[3]Indeed, even those courts that have concluded that the requirements of § 3582(c)(2) are
not jurisdictional still largely enforce the statutory prerequisites to relief.  *See, e.g.*, *Taylor*, 778
F.3d at 670 (recognizing that even if a court has the "power to adjudicate" a motion under §
3582(c)(2), it may lack "authority to *grant* a motion . . . because the statutory criteria are not met")
(emphasis in original).

appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."[4]

The requirement of a 30-day period to afford BOP the initial review of a defendant's request therefore cannot be excused. While Congress indisputably acted in the First Step Act to expand the availability of compassionate release, it expressly imposed on inmates the requirement of initial resort to administrative remedies. And this is for good reason: The Bureau of Prisons conducts an extensive assessment for such requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. As the Procedures reflect, the Bureau of Prisons completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. Its assessment will always be of value to the parties and the court.

For all of these reasons, BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations based on an inmate's background and medical history, and more general considerations regarding the conditions and needs at particular facilities. The provision of § 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at the present time. Even if this Court could ignore the mandatory exhaustion requirement, which it cannot, it would be imprudent to prevent BOP from engaging in that review.

---

[4]Unlike the exhaustion provision in *Ross*, which required only exhaustion of "available" administrative remedies, 136 S. Ct. at 1858, the compassionate release statute contains no such exception.

This remains true in the present crisis.  The Government does not downplay Ouazzani's concerns in any way, however, Ouazzani has not proven that he has fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on his behalf or the lapse of 30 days from the receipt of such a request by the warden of his facility, whichever is earlier.

### IV.  BOP Response to the Coronavirus Pandemic

The BOP has taken significant measures to protect the health of all inmates.  The BOP began planning for potential coronavirus transmissions in January 2020.  At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control (CDC), including by reviewing guidance from the World Health Organization (WHO).  On March 13, 2010, the BOP announced that it was implementing the Coronavirus (COVID 19) Phase II Action Plan in order to minimize the risk of COVID-19 transmission into and inside its facilities.  The Action Plan comprises many preventive and mitigation measures, including the following:

- **Screening of Inmates and Staff:** All new BOP inmates are screened for COVID-19 symptoms and risk of exposure. Asymptomatic inmates with a documented risk of exposure will be quarantined; symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols.  In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures. (Staff registering a temperature of 100.4 degrees F or higher will be barred from the facility).

- **Quarantine Logistics:** All BOP institutions establish quarantine areas within their facilities to house any inmates found to be infected with or at heightened risk of being infected with coronavirus pursuant to the above-described screening protocol.

- **Suspension of Social Visits and Tours:** The BOP placed a 30-day hold on all social visits and tours.

- **Suspension of Legal Visits:** The BOP placed a 30-day hold on legal visits, with exceptions permitted on a case-by-case basis.

- **Suspension of Inmate Movements:** The BOP ceased the movement of inmates amongst its facilities for at least 30 days, with exceptions for medical treatment and other exigencies.

-11-

- **Modified Operations:** BOP facilities modified operations in order to maximize social distancing.

On March 18, 2020, the BOP implemented Phase III of the Action Plan maximizing telework for locations that perform administrative services. All cleaning, sanitation, and medical supplies were inventoried, and sufficient supplies were on hand and ready to be distributed to facilities as necessary. The BOP placed additional orders for supplies, in case of a protracted event.

*See* https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_ update.pdf (phases I-III).

Phase IV of the Action Plan was implemented on March 26, 2020. The BOP revised and updated its quarantine and isolation procedures to require all newly admitted inmates, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check. Asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

On April 1, 2020, in response to a growing number of quarantine and isolation cases, the BOP implemented Phase V and directed the following actions be taken immediately to further mitigate the exposure and spread of COVID-19:

- For a 14-day period, inmates in every institution be secured in their cells/quarters to decrease the spread of the virus.

- During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

- The BOP is to coordinate with the United States Marshals Service to significantly decrease incoming movement during this time.

- After 14 days, this decision will be reevaluated.

- Limited group gathering will be afforded to the extent practical to facilitate, commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access.

*See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (phases IV-V).

Phase VI, implemented on April 13, 2020, extends all Phase V measures until May 18, 2020. *See* https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf. Further details regarding the BOP's COVID-19 action plan and efforts are available at https://www.bop.gov/resources/news/20200313_covid-19.jsp and at a daily updated resource page: https://www.bop.gov/coronavirus/index.jsp.[5]

Taken together, these measures are designed to sharply mitigate the risks of COVID-19 transmission in a BOP institution. BOP professionals continue to monitor this situation and adjust practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately inmates have nevertheless become ill, and more likely will in the weeks ahead. But the solution is not to exclude BOP from reviewing applications for compassionate release. There are many challenging factors to consider during this pandemic, and the BOP should have the opportunity to assess those factors during the statutorily required review period. For example, notwithstanding the current pandemic crisis, the BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess

---

[5]According to the resource page, due to the rapidly evolving nature of this public health crisis, the BOP will update the dashboard daily at 3:00 p.m. based on the most recently available data from across the agency as reported by the BOP's Office of Occupational Health and Safety.

release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced if any service), and of supervision of inmates once released (at a time that the probation office has necessarily cut back on home visits and supervision).

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, the BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Further, Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), enacted on March 27, 2020, permits the BOP, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau of Prisons, to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate." Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note.) On April 3, 2020, the Attorney General gave the Director of the BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidents of coronavirus transmission.

Even though the Government has asked this Court to dismiss Ouazzani's motion, the Government is sensitive to the issues Ouazzani raises related to the coronavirus pandemic. The Government does not minimize the concern or the risk to inmates such as Ouazzani. At the present time, the BOP has taken aggressive action to mitigate the danger for all inmates.

In this case, although Ouazzani expresses concern for his health related to the coronavirus pandemic, he does not allege he is in a category due to age or preexisting medical condition that places him in a high-risk category that would establish an extraordinary or compelling reason for a sentence reduction.

### V. Ouazzani has Not Identified Extraordinary and Compelling Reasons

The Sentencing Commission's pertinent policy statement related to extraordinary or compelling reasons appears at U.S.S.G. § 1B1.13. As amended November 1, 2018, the statement repeats the text of 18 U.S.C. § 3582(c)(1)(A) and adds that the court should reduce the sentence only if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

The BOP promulgated Program Statement 5050.50, amended effective January 17, 2019, to set forth its own internal criteria for evaluating compassionate release requests. Courts have frequently upheld the BOP's discretionary authority in its management duties over federal prisoners. *See Tapia v. United States*, 564 U.S. 319, 331 (2011) ("When a court sentences a federal offender, the BOP has plenary control, subject to statutory constraints, over [the place of imprisonment and treatment programs].").

Ouazzani only cites medical conditions as reasons for compassionate release. The application notes for U.S.S.G. 1B1.13 define "medical condition of the defendant" as:

Medical Condition of the Defendant.—

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(U.S.S.G. § 1B1.13 Application Note 1(A).)

In this case, Ouazzani claims

I also have what are known as "pre-existing conditions,' to include prior exposure to (latent) tuberculosis that I was diagnosed [with] during pre-trial detention at the CCA Leavenworth and was therewith treated for 9 months in the matter. . . . I also have high blood pressure and was on medication for such for at least two years 2010-2012, then on my own decided to manage it with dieting and exercise. It came back with a vengeance and I was again placed on a watch list for the last two years, it thereafter as not been treated on a daily basis. . . . I also have a family history of [l]ung [c]ancer. I have lost both parents to this vicious enemy of the human race. I recently had a shoulder surgery (March 2020) and have not had any post-surgery checkups, nor any physical therapies as to the recent Pandemic.

(D.E. 65 at 2-3.)

Ouazzani has made an inadequate showing of extraordinary and compelling circumstances. There is no evidence or claim that he is unable to provide self-care or perform daily living activities. Ouazzani has failed to sustain his burden to prove that he meets the requirements for compassionate release or a reduction of sentence. Ouazzani does not have a terminal illness or suffer from any physical or mental condition that substantially diminishes his ability to provide self-care within the correctional facility. There are no extraordinary and compelling reasons, as

those terms are defined for the purpose of 18 U.S.C. § 3582(c)(1)(A), justifying compassionate release or any form of sentence reduction in this case.

Ouazzani argues his medical condition places him at an increased risk should he contract the coronavirus. (D.E. 65 at 2-3.) Unfortunately, Ouazzani's circumstance is not extraordinary in the context that many individual across the nation are in the same or similar position as Ouazzani, and Ouazzani's medical condition remains the same whether he is released. While the Government is attune to the difficulties facing inmates, this particular instance simply fails to meet the requirements of the law and policy. In *Dillon v. United States*, 560 U.S. 817, 826, (2010) the Supreme Court determined that the sentencing court could only consider a reduction in sentencing if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. Based on that reasoning, U.S.S.G. § 1B1.13 Application Note 1(A) is mandatory and Ouazzani's request does not meet the requirements for release.

Moreover, Ouazzani only alleges one medical condition, high blood pressure, that the CDC identifies as increasing a patient's risks of complications from COVID-19. Ouazzani, however, does not say he is currently suffering from high blood pressure. Rather, he claims he had been treated medically for high blood pressure about 10 years ago, began managing the condition without medication about 8 years ago, saw the condition return at some point in the past but the treatment was only monitoring, indicating it was not severe enough to warrant medical treatment. Further, Ouazzani admits that he is currently no receiving any treatment for the condition. Thus, he does not allege or provide any support for a claim that he currently suffers from a condition that would place him in a high-risk category to suffers complications from COVID-19.

But even if Ouazzani did, that would not begin to state a ground for compassionate release. Rather, it would provide reason not to release him as he is currently in a facility that has no known cases among either inmate or staff. Ouazzani's motion recognizes this, making only claims as to

what would happen to him "if this virus gets into the prison." (D.E. 65 at 6.) As the virus is not in the prison, he is, as matter of fact, currently safer in custody, and Ouazzani's motion simply presents no ground for compassionate release.

### VI. <u>Ouazzani Remains a Danger to the Community</u>

This Court may not reduce Ouazzani's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13. Ouazzani is a danger to the community, and should not be considered for compassionate release.

Under 18 U.S.C. § 3142(g), this Court must consider four factors in determining whether a defendant might present a danger: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against a defendant; (3) the history and characteristics of a defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court, and (4) the nature and seriousness of the danger to any person or the community that would be posed by a person's release. 18 U.S.C. § 3142(g)(1)–(4). Consideration of these factors—which are not affected by COVID-19—does not allow this Court to conclude that Ouazzani is not a danger to the safety of any other person or the community.

First, the nature and circumstances of the charged offenses are exceedingly egregious. *See* § 3142(g)(1). Documents detailing Ouazzani's offense are largely filed with this Court under seal, and the Government respectfully refers this Court to those documents for a full recounting of Ouazzani's crimes. It is nonetheless worth noting that Ouazzani admitted committing multiple mortgage frauds during the heart of a financial crisis that largely resulted from mortgage fraud and then used some of his fraud proceeds to support a foreign terrorist organization that had the

declared purpose of killing Americans. These were highly aggravated crimes and underscore the danger to the community Ouazzani did, and continues, to present.

Ouazzani addresses his danger the community by quoting statements made by then United States Attorney Beth Phillips at press conference after his guilty plea. (D.E. 65 at 5-6.) While Ouazzani correctly recounts the words, he takes them widely out of context. The statements were made to assure the public that Ouazzani was not involved in active terrorist plot in the Kansas City area, which he was not. But stating that he did not pose "an imminent risk of harm" to the local community in no way disclaimed the extreme dangerousness of his crimes.

Second, the weight of the evidence was overwhelming. *See* § 3142(g)(2). Ouazzani pled guilty and has never contested his guilt in this case. In fact, he waived indictment and pled guilty to an information charging him with material support to a foreign terrorist organization.

Third, Ouazzani's history and characteristics are also detailed in his PSR and provide this Court no reason to grant him compassionate release. *See* § 3142(g)(3).

Nothing about the COVID-19 pandemic reduces Ouazzani's danger to others.

Ouazzani has failed to demonstrate that the § 3142(g) factors the court considered at the time of detention or the § 3553(a) factors the court considered at the time of sentencing have changed, therefore this Court should deny Ouazzani's motion for immediate release.

### VII. Record of Rehabilitation is Not an Extraordinary and Compelling Reason

Finally, Ouazzani asserts he has demonstrated a record of rehabilitation, and the Government does not dispute that the accomplishments Ouazzani has made in prison, as listed in his motion (D.E. 65 at 5), are laudable. However, rehabilitation of a defendant is not, by itself, an extraordinary and compelling reason for a reduction of a term of imprisonment. (U.S.S.G. § 1B1.13 Commentary n.3; 28 U.S.C. § 944(t).)

## VIII.  <u>Conclusion</u>

Based on the foregoing, the United States respectfully requests that Ouazzani's motion for compassionate release be denied.

Respectfully submitted

TIMOTHY A. GARRISON
United States Attorney

By    /s/ *Brian P. Casey*

BRIAN P. CASEY
Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Room 5510
Kansas City, Missouri  64106
Telephone:  (816) 426-3122

*Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a copy of the foregoing was delivered on May 28, 2020, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record and mailed to defendant at:

Khalid Ouazzani, *Pro Se*
Reg. No. 22147-045
FCI Safford
Federal Correctional Institution
P.O. Box 9000
Safford, Arizona  85548


*/s/ Brian P. Casey*
Brian P. Casey
Assistant United States Attorney