United States District Court of Missouri, Western District
Honorable Judge Howard S. Sachs
400 E. 9th Street
Kansas City, MO 64106

FROM: KHALID OUAZZANI
FCI SAFFORD
PO BOX 9000
SAFFORD, AZ 85548

RE: REPLY TO GOVERNMENT'S RESPONSE TO THE PENDING MOTION FOR COMPASSIONATE

RELEASE UNDER THE FIRST STEP ACT OF 2018, SECTION 603(b) AND 18 U.S.C. SECTION 3582(c)(1)(A)(i)

I respectfully ask This Honorable Court to seal this document

IN CASE NO: 10-00025-CR-W-BCW

Now comes, Khalid Ouazzani (Petitioner) acting pro se, in the above cited manor, having recently received the government's response to the main pending above motion, and updated documents (i.e.: Correspondence with FCI Safford Warden) from the institution (FCI Safford) Unit Team Department to which were principally withheld.

This to which petitioner now forwards and places this honorable court on notice at such, and therewith requests that this court have the availability at such in its decision-making process in this matter respectfully.

## I. REPLY:
------------

### A. FACTS:
Due to the response to the COVID-19 pandemic, and more recently the growing unrest as part of the protests in several cities across the country, the BOP has implemented a nationwide lockdown. This imposed restriction in movement has significantly limited petitioner's access to the law library, and the necessary resources for document gathering and preparation. Such restrictions have severely affected petitioner's ability to respond to the government's factual assertions in a thorough and timely manner. Petitioner kindly asks this court to factor these considerations upon review.

Petitioner respectfully points to the facts presented in the motion(request) for compassionate release (identified at DKT. #65). Therewith is this reply, the government's response recites the "procedural history" of this petitioner's criminal actions, as yes, petitioner did plead guilty in a very timely fashion, and therefore has showed his acceptance of responsibility for his crimes. Nonetheless, as cited, petitioner was sentenced to 168 months, with a projected release date of January 9, 2022(id at 3).

Thus, as petitioner has been in custody since February 5, 2010, he has essentially served over a decade in prison and as the record supports has a mere 18 months left on his sentence, and is otherwise eligible for Community Custody, better known as "Residential Release Custody" in 6 months. See 18 U.S.C. 3624(c)(4).

Therefore, in the event this honorable court see fit to exercise its equitable authority herewith, it would result in a 6 months sentence reduction. (id. "up to 12 months in RRC placement + 6 months = 18 months). This is not unreasonable, and this reply continues.

## B. EXHAUSTION:

The government spends the majority of his argument on its assertion that somehow petitioner has not exhausted as required under the statute. (id. 4-11)

However, it does recognize that the exhaustion requirement under the Act (i.e. "the First Step Act) is, "after 30 days have passed" after the presentment to the [BOP]. (id.4) Take note that this should read "the warden" see id. section 603(b).

The government posits case law from outside of the circuit decisions to which were rendered ante the First Step Act. See id. pg.4, citing United States v. Butler, 970 F.2d. 1017, 1026(2nd Cir. 1992); CF. United States v. Hamilton, 715 F.3d.328, 337(11th cir 2013). This by another provision of the statute at 18 U.S.C. 3582(c)(2) (id) continuing at pgs. 6-7, and in n.1.(id). Therein the courts decisions which the government cites are all "Pre-First Step Act" decisions and inapplicable post-Act.

However, the government states correctly, that exhaustion is required in order this Honorable court to take jurisdiction in this matter nonetheless, it fails to understand that petitioner did in fact make this prerequisite request, however, as to the assertion that as is widely understood by even the government itself in its response "Petitioner (as well as the entire FBOP) is on "lockdown status."(see id. pgs. 12-13)

Therewith, yes, Petitioner has accessibility only to a close circuit intra-net styled computer system via what is known as TRULINCS. This to which I may make "electronic staff requests" which are forwarded to whatever department or element of the facility including as pertinent here "the warden". The message (request) and its response is then lodged into the system to which I must go through other messaging and purchase orders and the like to petition these administrators to print the documents "for me", which and to be used to gain jurisdiction in Federal Court to seek the release that they're either denied, or failed to answer. (see ATT.#1)

This is also true for the "medical records". It appears very cordial and in line with a seemingly good faith cooperative effort, however, making this request, and having it fulfilled in a smooth timely manner is whole other animal. (See ATT.# 2)

It was therefore presented as asserted in the plain language of the motion(request) in this Court that there was difficulty in this area to acquire and present such. However, with an ORDER from this court certainly there would be no problems, furthermore as this government attorney is fully aware of this matter, it as being representative thereof could easily acquire these documents and make the presentments in these difficult times.

However, in the face of these assertions it now seeks to capitalize from this petitioner's incapacity to which is outside of his hands and is powerless.

Nonetheless, though this government's attorney seeks to correlate the prisoner litigation Reform Act (PLRA's) provisions embedded in 42 U.S.C. 1997 to which mandates the exhaustion of all "such remedies that are available."(id pg. 9) See Andres v. Marshall, 867 F.3d.1078-79(9th cir 2017)

Thus, bring forth reasons to which would demonstrate that this process is either "futile or is prevented could be plausible" but, this is unnecessary in light of the fact that it agrees that "an inmate need not 'exhaust' administrative remedies if the motion is filed in court 30 days after a receipt of a 'request by the warden'." See id. pf 8, n.2

Also, upon first opportunity I did in fact acquire this documentation and my medical records with which to support these assertions. These to which have been forwarded to this court upon first opportunity. (Medical Records through certified mail on 5-14-2020, Exhaustion requisite is attached to this reply).

However, and again petitioner has in fact exhausted his remedies in this matter and the government's attempts to refute such are misplaced and should be disregarded, this Court has jurisdiction.

## C. COVID-19 CRISIS FORESEEABLE THREAT TO PETITIONER'S HEALTH AND SAFETY:

The government also points to the FBOP's attempts to provide, for the "Protection health of all inmates." (id 11-15) This is by explaining the effort to make for essentially a "lockdown status" (i.e. quarantine, suspension of visits, inmate movements, etc.) see Phase II action plan, III, IV, V, and VI. (id 11-12)

This Action Plan and process is fine, however, it fails to address the crux of the matter presented that, as to the President of The United States, The CDC, and virtually every other member of the world's society's directive to practice what has been coined as "Social Distancing". Petitioner is in a "Low-Security Facility" as to his good behavior over the last decade, and consequentially he is in an "open dormitory styled setting", collectively with over 100+ other prisoners, sharing every possible or allowed facility, and is actually prevented from the ability to distance himself from others as such, and thus, in a state of peril to a heightened degree.

Furthermore, the BOP and FCI Safford's Warden have a duty to protect me from this foreseeable danger under 18 U.S.C. 4042(a)(1)-(4). See Edison v. United States, 822 F.3d.510, 519(9th cir, 2016)("...the BOP's status as a land owner and jailer gave rise to a duty to protect....prisoners from harm..."), see also Sandoval v. United States, CV-17-3092 DMG(skx), 2019 U.S. Dist. Lexis 222615(C.D. Cal. Nov25, 2019)(..."The BOP Statutory duty of care...")

In the district court's decision in Sandoval is a case arising from this very institution, and thus is fully aware of these matters.

Furthermore, as the government has not acknowledged this position nor delved any further into the plain accusations, its positions that "...the government is sensitive to the issues [Ouazzani] raises related to the Coronavirus pandemic..." (id. Govt' Resp. 15) is contra its true position.

In an opinion by Honorable Judge Anita B. Brody in U.S. V. Rodriguez (2:03-cr-00271-AB-1, ED Pennsylvania):
"I conclude the (1) the court may independently assess whether "extraordinary and compelling reasons" exist; (2) the COVID-19 pandemic -in combination with Mr. Rodriguez's underlying health conditions, proximity to his release date, and rehabilitation-constitute "extraordinary and compelling reasons" that warrant a reduction..."
"...the government's assurances that the BOP's "extraordinary actions" can protect inmates ring hollow given that these measures have already failed to prevent transmission of the disease at the facility where Mr. Rodriguez is housed...Prisons are ill equipped to prevent the spread of

COVID-19. Public health experts recommend containing the virus through measures such as social distancing, frequently disinfecting shared surfaces, and frequently washing hands or using hand sanitizer. Joseph J. Amon, an infectious disease epidemiologist and director of global health and clinical professor in the department of community health and prevention at Drexel Dornsife School of Public Health, has studied infectious diseases in detention settings and states: 'Detention facilities have even greater risk of infections spread because of conditions of crowding, the proportion of vulnerable people detained, and scant medical care. People live in close quarters and are also subject to security measures which prohibit successful "Social Distancing" that is needed to effectively prevent the spread of COVID-19. Food preparation and food service is communed, with little opportunity for surface disinfection. The crowded conditions, in both sleeping areas and social areas, and the shared objects(bathrooms, sinks, etc.) will facilitate transmission....some jails and prisons have already become COVID-19 hot spots...the BOP's containment measures have already proven insufficient to prevent the spread of COVID-19...".

As of June 05, the BOP has reported 1951 known cases of COVID-19 among inmates and staff, and 78 deaths among inmates. While COVID-19 infections have plateaued across the United States, in Arizona, cases have continued to spike, resulting in over 1000 deaths statewide (24,332 cases, 1012 deaths as of June 05, 2020). According to health experts from Arizona State University and the Arizona Department of Health and Safety (ADHS), the number of confirmed COVID-19 cases in the state have jumped 60% since the stay-at-home order was lifted on May 15th, 2020.

Though FCI Safford resides in Graham county where the number of active cases remain low, it is well known that many staff members working within the institution frequently commute and/or travel to and from neighboring Tucson, AZ(Pima county) which has the second largest number of confirmed COVID-19 cases in the state. With the stay-at-home order lifted, and staff now free to travel within the state, there is a growing concern that non-symptomatic transmission will soon introduce COVID-19 into the institution. Without adequate testing, this leaves inmates at FCI Safford, including petitioner, increasingly at risk for infection. As many staff members, including the Acting Warden have stated, it's not a matter of "If", but "when" Covid-19 will hit FCI Safford.

"Cases in the State of Arizona continue to escalate, with 5000 new confirmed infections reported since June 1st. Arizona made the national news on June 9th, reporting the highest seven-day growth in cases in the nation. The recent spark has triggered an emergency response from the State, concerned with the surge in demand for ICU bed space. As infections continue to grow in the local community and neighboring Tucson, it has increased the risk of COVID-19 being introduced into the institution. (6-09-2020: 28,296 cases, 1070 deaths, 41 cases in Graham County (where FCI Safford is))."

## D. MEDICAL ISSUES:

This as to the fact that, too petitioner has presented evidence of what are come to be known as "pre-existing conditions" and is otherwise vulnerable to the COVID-19 in the unfortunate and likely(foreseeable) event this FCI Safford is infected.

This to which the government minimizes throughout its response as somehow "not an extraordinary and compelling circumstances." (id. 16-18).

This to which "Hypertension" has been seen as such, as a "catastrophic health consequence, and is otherwise 'particularly vulnerable'" See United States V. Sawicz, No 08-cr-287(ARR) (E.D.N.Y. April 10, 2020)

Medical records from the Petitioner show that the Bureau of Prisons have measured / identified on several occasions evidence of high blood pressure, which for the last three years has not been controlled. Despite expressed concerns, this condition continues be left untreated, which can be construed as deliberate indifference to a serious medical condition. It has been well documented that hypertension is a contributing factor, which greatly increases a patient's chances of requiring intensive care, and / or resulting in death, should one contract covid-19. This condition leaves the Petitioner increasingly vulnerable.

Petitioner recently underwent shoulder surgery in March 2020. There was no follow-up evaluation performed by the surgeon. Post-surgery evaluation was not performed for well over two months, and was only recently followed up on May 29th. The evaluation was very minimal, and did not include a thorough review as would typically be performed by an outside physician. Further, the Institution has not provided physical therapy. This further demonstrates the inadequate lack of proper health care commonly provided by Institutional health providers.

Also, the issue with the hereditary lung disease. See Miller V. United States, No 16-20222-1(E.D. Mich. April 9, 2020) Petitioner's diagnosis of TUBERCULOSIS(TB) is a serious medical condition as defined by the sentencing commission policy statement and that this disease in combination with the serious risks presented by the Coronavirus Pandemic constitutes extraordinary and compelling reasons to grant Petitioner immediate release.

There can be little doubt that incarcerated individuals face an even greater risk of transmission, given the conditions frequently present in correctional and detention facilities. See U.S. V. Kennedy No 18-20315, 2020 U.S. Dist. lexis 53359, at (ED Mich Mar 27, 2020). These conditions include among other things, the highly congregational environment, the limited ability of incarcerated persons to exercise effective disease prevention measures and social distancing, and potentially limited onsite healthcare services. Id

Although the government argues that the Federal Bureau of Prisons has put in place aggressive measures to prevent the spread of COVID-19, positive cases among federal prisoners continue to rise, and it does not appear that preventive measures are sufficiently working yet to flatten the curve in BOP facilities. See Walter Pavlo, "FBOP institutions not showing any signs of flattening curve" FORBES. https://bit.ly/2rl1ff2

In an opinion by Honorable Judge Laurie J. Michelson in U.S. V. Atwi 18-20607(ED Mich, Southern Div. Apr, 2020): "...The centers for disease Control and Prevention (CDC) explains that there are significant differences between active and latent Tuberculosis (TB). Unlike active TB which affects the lungs and is highly contagious, people with latent TB are not contagious and have no symptoms....Because COVID-19 is so new, there has been limited opportunity to study the interaction between TB and COVID-19, but one court in California has noted: 'One observation study studied the relationship of TB and COVID-19 in 36 confirmed COVID-19 patients. It found that "individuals with latent or active TB may be more susceptible to SARS-COV-249 infection." It also found that "COVID-19 disease progression may be more rapid and severe in those with latent and active TB. It identified" TB history (both active and latent) [as] an important risk factor for SARS-COV-2 infection." The study noted that its findings are limited because it is based on a low number of cases. Doe v. Barr, No 20-CV-02141-LB, 2020 U.S Dist. Lexis 64459, 2020 WL 1820667, at(N.D. Cal, Apr 12, 2020)(citing Yu Chen, et, al. Active or

latent TB increases susceptibility to COVID-19 and disease severity(03-2020)https://bit.ly/2VJO55Y).

But regardless of whether latent TB can make a person more susceptible to catching COVID-19, if Atwi does catch it, the risks to someone with a co-infection of TB and COVID-19 are readily apparent", as both are respiratory diseases that affect the lungs. See Max Bearak and Joanna Slater. "Among the most vulnerable to coronavirus: The tens of millions who carry HIV and TB." Washington Post: https://wapo.st/2XBSNB5. The court is not willing to take that risk, and it appears the Attorney General does not want the BOP to take this type of risk either. See office of the Attorney General, Memorandum for Director of the Bureau of Prisons...."

## E. BOP'S AUTHORITY:

Also, the government points to the BOP's authority to place individual inmates on home confinement pursuant to its recent authority under the C.A.RE. S Act at Section 12003(b)(2), also 34U.S.C. 34 U.S.C. 60541(g). However, petitioner has seen less than 10 out of 850 plus inmates placed under this program and has also been denied such personally.

This is being used "Sparingly at best" with the FBOP, and certainly at FCI Safford. As this is as the government puts it "a discretionary function of the FBOP" then a person of the charges of which I am convicted can simply forget it.

As cited, the government points to the provision in 18 U.S.C. 3624(c)(2) which it states:"...the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter."(id. at 14)

Under the provisions of the Second Chance Act of 2007 to which this provision was amended, it too allows for placement in Community as RRC placement, "for up to twelve months." See 18 U.S.C. 3624(c)(4), Pub.L.No. 110-199, Section. 251, 122 Stat.657, 692(2008).

This "one year maximum" to which any eligible inmate qualifies would seriously minimize a lot of the clutter of this prison, however, petitioner personally knows numerous individuals to whom are well under the one year mark, and to which are being denied even the most rudimentary of this availability, and again, as to the discretionary nature of these statutes a prisoner can simply forget it. Absent a directive from this Honorable Court to release under the provisions of this First Step Act under 18 U.S.C. 3582(c)(1)(A)(i) and the corresponding policy statement at USSG 1B1.12, cmt.n.1(D)...this petitioner will remain in custody subject to the peril, in the boom to which may or may not ever come. However, petitioner merely seeks a reduction in sentence that will call for a 6 months reduction adding the "one year"(discretionary authority) for a total of 18 months. This is not unreasonable. This to which not even the government contests. (id. at 15, "even though the government has asked this court to dismiss Ouazzani's motion, the government is sensitive to the issues that Ouazzani raised related to the Coronavirus pandemic.")

Petitioner has presented serious medical issues to which do place him in a "high-risk category" and in the event he is infected, he is in serious danger of death or serious injury. This to which he was not sentenced.

This to which the government replies in yet another polar opposite position to where it states:" In this case, although Ouazzani expresses concern for his health related to the Corona virus pandemic, he does not allege he is in a category due to age or "preexisting medical condition that places him in a high-risk category that would establish an extraordinary or compelling reason for a sentence reduction." (id. 15)

It then cites thereafter, "Ouazzani only cites medical conditions as reasons for compassionate release." (id. 15)

This is precisely why this petitioner calls upon this Honorable court to intervene and grant relief.

There are cases which allow for a judicial recommendation to place a prisoner in for this eligibility but, it is non-binding. See United States v. Parlin, 2019 WL 5268542(D. Nev. Oct 17, 2019) (Citing United States v. Caballos, 671 F.3d.852, 855 (9th Cir. 2011); See also United States v. Langhan, 670 Fed. Appx. 991-992-933(10th Cir, 2016)

## II. ARGUMENT:

-------------------

Primarily, as the government believes that somehow, "this particular instance simply fails to meet the requirements of law and policy." (id. 17, citing Dillon V. United States, 560 U.S. 817, 826(2010)).

This position is "off the mark". First of all The Supreme Court's decision in Dillon is again, as to a different provision in 18 U.S.C. 3582(c)(2), not The First Step Act's amendments to the Compassionate Release provisions in 18 U.S.C. 3582(c)(1)(A)(i). This to which the government has not addressed the cases presented by petitioner in United States v. Cantu, No. 1:05-cr-458-1, 2019 U.S. Dist. LEXIS 100923, 2019 WL 2498923, *1(S.D. Tex. June 17, 2019)

These to which also are consistent with several other District Courts to which state:"[W]hile the sentencing commission and the BOP criteria remain 'helpful guidance', the amended section 3582(c)(1)(A)(i) vests courts with independent discernation to determine whether there are 'extraordinary and compelling reasons' to reduce a sentence the same." See United States v. Redd, 2020 U.S. Dist. Lexis 45977, 2020 WL 1248493, at *7(E.D.VA. March 16, 2020), See also United States v. Owens, 97cr-2546, ECF. NO. 93, at *4, 2020 U.S.Dist. Lexis 61460(S.D.Cal. March 20, 2020), and United States V. Urkevich, 2019 U.S.Dist. Lexis 197408, 2019 WL 6037391, at *3(D. Neb. Nov. 14, 2019)

Therefore, this Honorable Court on its own may use Application Note 1(D) as a basis for finding of extraordinary and Compelling reasons to reduce a sentence. See U.S. v. Brown, 411 F.supp.3d. 446, 450 (S.D. Iowa Oct. 8, 2019)

A. DANGER TO THE COMMUNITY:

-------------------------------------------

The government has insisted that the petitioner would pose a danger to the community if released now, and therefore should serve the remaining 18 months of his sentence, for no other reason other than the crimes he had committed. Petitioner agrees herewith, that the "nature and circumstances of the charged offense one exceedingly egregious."(id. Govt Resp. at 18, citing 18 U.S.C. Sec. 3142(g)(1))

However, petitioner presents that this is belied by the fact that his co-conspirator convicted in a separate court was released on May. 25, 2020, under compassionate release. See United States v. El-Hanafi, 10-cr-162-KMW. And the fact that petitioner was the main government's witness against all co-conspirators, who efficiently helped the government bring to justice and convict all other co-conspirators.

The government has provided no basis for finding that the petitioner will repeat his past mistakes and crimes. Whatever speculative risks of recidivism exist; the government has failed to show how the petitioner poses a greater risk than any other defendant who has served the time

legislative has decreed for the crimes committed. Beyond that, petitioner is a first-time offender, who has showed great remorse since his arrest, has been a model inmate, having worked his way down to minimum custody level through good behavior and hundreds of hours of successful programming. Petitioner has acted as instructor, teaching French, fitness and nutrition programs, while learning other crucial life and career new skills.

Petitioner's record of rehabilitation while in prison tends to show that he is unlikely to be a danger to his community(See Pepper v. U.S. 562US476 at 491, 131 s.ct. 1229, 179 L.Ed.2d.196," In assessing...deterrence, protection of the public and rehabilitation...there would seem to be no better evidence than a defendant's post incarceration conduct."). Petitioner had no recent disciplinary infractions, acted as a mentor and instructor to other inmates, while maintained strong family ties. Petitioner's extensive programming, includes certification in "HEATING, VENTILATION AND AIR CONDITIONING" from ALAMO COLLEGES with over 360 hours of courses requirements, and was certified as a "TECHNICIAN TYPE II" "EPA APPROVED" BY COASTAL BEND COLLEGE which shall allow me lawful employment. Petitioner was also certified as a "SUICIDE OBSERVER" and participated in numerous actual suicide watch sessions, helping other inmates cope with prison difficulties. Petitioner had completed NON-RESIDENTIAL DRUG PROGRAM, ANGER MANAGEMENT, CRIMINAL THINKING, NATIONAL PARENTING PROGRAMS.

Also, by the fact that though a long-term of incarceration petitioner was sentenced to 168 months to which as again there remains a mere 18 months, respectively.

Therefore, even if petitioner is required to serve the remainder of the full term (18 months) he will be in the community in the near future, and thus the question remains, "What is going to change, as to dangerousness from now and 18 months?"

What is of the day, is the danger that is in the loom to petitioner in the interim. This to which is a serious threat to the safety of the petitioner in the environment to which he is currently forced to live contrary to the CDC's directives and thus, petitioner is in fact safer in prison than in the community.

Petitioner does have a home to be released to, transportation, and a job. For this, and all the reasons stated, Petitioner's release poses no threat to the community, and no burden on society as a whole. The competing interest left over is the government's objection to release, all other interests are in the favor of petitioner's release.

## III. CONCLUSION:
--------------------

Wherefore, petitioner respectfully requests that this Honorable Court exercise its properly endowed authority under 18 U.S.C. Section 3582(c)(1)(A)(i) to grant equitable relief in the form of an 18 months sentence modification, and issue an ORDER for his immediate release to The Supervised Release Phase of the Criminal Sentence to which would subject this petitioner to The Supervision of the Probation Department and any directive of this Honorable Court, respectfully,

---------

--------------------------------

Khalid Ouazzani
Petitioner, PRO SE
Date: June 07,2020

IV. CERTIFICATE OF SERVICE:
------------------------------------

    THAT I, KHALID OUAZZANI, DO HEREBY SWEAR AND AFFIRM, THAT I DID, MAIL A TRUE AND CORRECT COPY OF THIS REPLY TO THE GOVERNMENT, POSTAGE PRE-PAID, BY U.S. mail, on this _____ *Ten th* _____ day of 2020, and addressed as follows: (28 U.S.C. Sec. 1746)

X _Khalid Ouazzani_
Khalid Ouazzani

AUSA Brian P. Casey
400 E. 9th street, RM 5510
Kansas City, MO 64106